**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

```
_____
                                )
STEVEN J. HATFILL,              )
                                )
          Plaintiff,            )
                                )
v.                              )     Civil Action No. 04-0807
                                )
THE NEW YORK TIMES COMPANY,     )
                                )
          Defendant.            )
_____)
```

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant's Motion for Summary Judgment.  Plaintiff filed a three-count Complaint in this Court asserting causes of action for defamation and intentional infliction of emotional distress in connection with a series of columns authored by Nicholas Kristof that appeared on the Op-Ed pages of The New York Times.  Count One for defamation alleges that the columns written by Nicholas Kristof and published by the New York Times falsely implicate Plaintiff in the 2001 anthrax mailings that killed at least five individuals.  Count Two, also for defamation, alleges that eleven discrete allegations within the columns tend to incriminate Plaintiff in the anthrax mailings.  Count Three alleges intentional infliction of emotional distress on the ground that the public identification and implication of Plaintiff with the anthrax

deaths was "unconscionable, malicious, intentional, and calculated to inflict grievous emotional distress on [Plaintiff]."

Plaintiff commenced this action on June 13, 2004. Defendant moved to dismiss all counts, and this Court granted dismissal on the ground that Plaintiff failed to state a claim upon which relief could be granted. On July 28, 2005, the Fourth Circuit reversed in substantial part this Court's decision, holding that Plaintiff had adequately pled the elements of all of his claims. Defendant's petition for a rehearing and rehearing en banc was denied, as was Defendant's petition to the United State Supreme Court for a writ of certiorari. The parties have now completed extensive discovery and the matter is again before this Court on Defendant's Motion for Summary Judgment.

The columns at issue, published during the summer of 2002, recount the failures of the Federal Bureau of Investigation (FBI) in its investigation of the anthrax mailings that occurred in the fall of 2001. In these columns, Mr. Kristof highlights specific mistakes made in the FBI's investigation. As an example of the FBI's shortcomings in the anthrax investigation, the columns focus in large part on the FBI's failure to adequately investigate Plaintiff, Steven Hatfill.

Prior to the publication of Mr. Kristof's columns, Plaintiff established a reputation in the field of infectious disease and

bioterrorism research.  In 1996, the National Institutes of Health (NIH) awarded plaintiff a fellowship to work on a NASA program relating to human-tissue research and infectious disease. The next year, Plaintiff received a fellowship that authorized him to work at the United States Army Medical Research Institute for infectious diseases (USAMRIID).  Plaintiff began work there in the fall of 1997 and remained there until 1999.  While at USAMRIID, Plaintiff had security clearance to work with Biosafety Level 3 pathogens, including anthrax, plague, and monkeypox. Throughout his tenure at USAMRIID, Plaintiff provided briefings to government officials and to various military, intelligence, and law-enforcement agencies within the federal government on issues of biological weapons and the country's preparedness for an attack.

Dating as far back as 1996, Plaintiff took it upon himself to publicize the threat posed to the United States from biological weapons.  While at NIH, Plaintiff posed for a picture demonstrating how a determined terrorist could create a biological weapon, such as the plague, in his own kitchen. Plaintiff's participation in this demonstration was noticed by Quebec Science magazine, and led an editor to question Canada's preparedness for a bioterrorist attack.  In August 1997, Plaintiff provided an interview to a Washington Times columnist on the subject of bioterrorism, and specifically the threat of

anthrax being used as a weapon.  During this interview, Plaintiff noted that the United States' health care system was ill prepared for such an attack.

In January 1998, Plaintiff provided an interview to <u>Insight</u> magazine about the risks of a biological attack and how an anthrax attack could be orchestrated.  Also that year, Plaintiff offered his thoughts and expertise on nationally syndicated radio and television shows and discussed bioterrorism and the need for increased government vigilance.  Plaintiff also drafted a novel, which he registered with United States Copyright office, describing a scenario in which a terrorist sickens government officials with a biological agent.  The novel was never published.

Members of the scientific community within Plaintiff's area of expertise viewed Plaintiff as an expert in his field, and drew upon his expertise on several occasions.  His co-workers and colleagues believed that he was very knowledgeable in the area of biological weapons and agents.  While working at USAMRIID, Plaintiff gave an interview about his own background to Richard Preston for inclusion in his book, <u>The Hot Zone</u>.  In 1998, Plaintiff sat on a panel alongside two of the country's leading experts in the production of dry anthrax  addressing the subject of biological weapons.  Plaintiff also held himself out as having a working knowledge of wet and dry biological weapons.

In January 1999, Plaintiff took a position with Science Applications International Corporation (SAIC), one of the nation's largest government contracting firms.  At SAIC, Plaintiff served as a lecturer for the State Department on the medical effects of chemical and biological agents.  Plaintiff designed and gave classified lectures on biological weapon production to the CIA, the DIA, and special operations units of the armed forces.  In addition, Plaintiff attended a classified lecture which described the process for producing powdered anthrax, and on at least one occasion, delivered a lecture on weaponizing anthrax.  In September 1999, Plaintiff co-authored an article in the journal <u>Surgical Services Management</u> entitled "Answering the Chemical and Biological Warfare Threat," which urged the public health community to step up efforts prepare for a chemical or biological attack.  Pursuant to a SAIC contract with the Joint Special Operations Command at Fort Bragg, Plaintiff supervised the creation of a simulated biological weapons laboratory inside an shipping container and trained forces how to recognize and destroy such containers.  Government officials sought Plaintiff's advice on matters of national security and bioterrorism, and considered him an expert in biological weaponry.

In August of 2001, three weeks before the anthrax mailings, the Defense Security Service suspended Plaintiff's security

clearance.  As a result of this suspension, SAIC terminated Plaintiff in March of 2002.  After leaving SAIC, Plaintiff took a position with Louisiana State University to work on a federally-funded program, a program which Plaintiff described as being one of national importance.  The program dealt with biological weaponry and training of federal and state governments in the proper response to a bio-terror event.

In the fall of 2001, an unknown individual sent letters laced with anthrax to several news organizations and members of Congress.  Following these attacks, Plaintiff spoke with a reporter for ABC News offering his opinion that the anthrax attacks were probably not of domestic origin.  He also sent a letter to three doctors discussing the characteristics of the mailed anthrax and touting his expertise on anthrax as a biological weapon.

During the first few weeks of its investigation, the FBI identified Plaintiff as a person of interest.  The FBI interviewed Plaintiff and conducted at least one polygraph examination. The FBI also conferred with Dr. Barbara Hatch Rosenberg, a Ph.D. molecular biologist at the State University of New York, meeting with her on several occasions to discuss the investigation and her profile of the anthrax mailer.

By early 2002, the media began to focus on Plaintiff, but did not identify him by name.  In June 2002, the FBI searched

Plaintiff's apartment.  This search generated a significant amount of news coverage.  The FBI also searched Plaintiff's car and a condominium owned by Plaintiff's girlfriend.  The FBI seized several items in these searches, including notes regarding the anthrax mailings, a spinner flask of anthrax stimulant, and a container of Cipro.

In August 2002, LSU placed Plaintiff on administrative leave after the United States Department of Justice directed the University to cease using Plaintiff as an instructor and terminate government funding of his programs.  That same month, Attorney General John Ashcroft identified Plaintiff on national television as a "person of interest" in the anthrax investigation.  Soon after, Plaintiff held press conferences to refute allegations that he was in any way involved with the attacks.  On August 26, 2003, Plaintiff filed a lawsuit against Attorney General Ashcroft, the DOJ, the FBI and others, charging them with accusing Plaintiff without formally naming him as a suspect or charging him with any wrongdoing.

Nicholas Kristof is an Op-Ed columnist for Defendant, the New York Times.  Beginning in the fall of 2001, Mr. Kristof undertook to stir public debate over national security and specifically, opined on how the anthrax investigation was proceeding.  From January through August of 2002, Mr. Kristof wrote a series of six Op-Ed columns on the subject.  Mr.

Kristof's columns expressed his views that the FBI was not pursuing the investigation in an acceptable manner.  He pointed out that the FBI's failure to investigate Plaintiff fully was an example of the Bureau's inadequacies.  In each column, Mr. Kristof stressed Plaintiff's denial of wrongdoing, reported that Plaintiff's friends viewed him as a patriot, and urged the FBI to investigate Plaintiff more aggressively or exculpate him altogether.

All but the last column, which identified Plaintiff by name, referred to Plaintiff by the pseudonym "Mr. Z."  Mr. Kristof identified Plaintiff by name only after Plaintiff had appeared in a press conference refuting allegations of his involvement in the anthrax mailings.  Mr. Kristof contends that he used the pseudonym "Mr. Z" so as not to direct unwarranted attention to Plaintiff.  In gathering information for his columns, Mr. Kristof researched a variety of news reports about Plaintiff and the investigation, reviewed documents related to Plaintiff, and consulted with prominent scientists and friends and colleagues of Plaintiff.

The case before this Court centers on the aforementioned facts.  Defendant now asks this Court to grant summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court must grant summary judgment if the moving party demonstrates "that there is no genuine issue as to any material

8

fact and that the moving party is entitled to judgment as a matter of law."  In reviewing a motion for summary judgment, courts view the facts in a light most favorable to the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party then has the burden of showing that a genuine dispute as to any material fact does exist.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 248.  "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In a defamation case, a plaintiff's burden of proof depends on the classification of the plaintiff as either a private figure, or a public figure or public official.  To recover compensatory damages for defamation, a public official or public figure must show actual malice while a private figure may recover with a lesser showing of culpability.  Gertz v. Robert Welch,

Inc., 418 U.S. 323, 347-48 (1973); see also Reuber v. Food Chemical News, Inc., 925 F.2d 703, 708 (4th Cir. 1990).  When the matter involved is a matter of public concern, either type of plaintiff must show malice by clear and convincing evidence. Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990).  Therefore, this Court must first determine Plaintiff's status as a public or private figure.[1]   A defamation plaintiff is a "public official" where his "position in government has such apparent importance that the public has an independent interest in qualifications and performance of the person who holds it."  Rosenblatt v. Baer, 383 U.S. 75, 85-86 (1966).  Such interest must go beyond the "general public interest in the qualifications and performance of all government employees."  Id.  A defamation plaintiff that receives this designation receives less protection under defamation law because the interests in public discussion are particularly strong and outweigh society's interest in preventing attacks on reputation. Id. at 86.

In applying this standard, a court must consider whether the individual's position is "one which would invite public scrutiny and discussion of the person holding it, entirely apart from the

_____

[1]Whether a defamation plaintiff is a public official or public figure is an issue of law to be resolved by the court. See Wells v. Liddy, 186 F.3d 505, 531 (4th Cir. 1999).  A court making this determination must "look through the eyes of a reasonable person at the facts taken as a whole." Foretich v. Capital Cities/ABC, 37 F.3d 1541, 1551 (4th Cir. 1994)(citation omitted).

scrutiny and discussion occasioned by the particular charges in controversy.  Id. at 86 n.13.  For a plaintiff to be deemed a public official, he need not hold a formal government position.  Rather, a plaintiff may be deemed a public official when he has, or appears to the public to have "substantial responsibility for or control over the government affairs."  Baumback v. American Broadcasting Co., No. 97-2316, 1998 U.S. App. LEXIS 18770, at *13-14 (4th Cir. Aug. 13, 1998)(noting that according to the plaintiff's curriculum vitae, the plaintiff "maintained the appearance that he wielded substantial control").  Thus, the designation of "public official" turns on whether the plaintiff had "substantial responsibility - actual or apparent - for administration of governmental matters."  Id. at *8.  In making this determination, courts examine whether the plaintiff "made [] recommendations, participated in [] policy determinations, and exercised [] discretion."  Id. (quoting Arctic Co. v. Loudoun Times Mirror, 624 F.2d 518, 521-22 (4th Cir. 1980)).

In this case, Plaintiff qualifies as a public official both in fact and in appearance.  Plaintiff left his formal government position when he went to work at SAIC.  Nevertheless, he continued to perform governmental functions as a contractor with the government, sharing his expertise in the field of biological warfare, and as a participant at LSU in a government-funded program dealing with biological weaponry and training of other

government officials and special forces.  In the course of his work, Plaintiff regularly made recommendations to highly-ranked government officials with respect to biological weaponry. Plaintiff also exercised discretion in developing training programs and protocols for the CIA, the DIA, the State Department, and certain elite branches of the armed services.  At the time Mr. Kristof's columns appeared in print, Plaintiff was receiving federal funds to work on national defense programs that he himself described as being of "national importance."

Based on the above facts, this Court finds that Plaintiff qualifies as a public official for purposes of this defamation action.  Plaintiff's participation in government training and decisionmaking placed him in a position of public trust.  The public had an independent interest in Plaintiff's qualifications and performance given the highly sensitive nature of his work and its importance to national defense.  His responsibilities and close connection with the federal government rendered him a public official.

Even if Plaintiff were not worthy of "public official" status, the Court finds that Plaintiff qualifies as a "public figure."  There are two types of public figures relevant to this matter: a "limited purpose" public figure and an "involuntary" public figure.  See Gertz, 418 U.S. at 345, 351 (identifying three distinct categories of "public figures").  A limited

purpose public figure is a person who has pursued a course of conduct that "invite[s] attention and comment" and has "access to the channels of effective communication." Id. at 345.  The Fourth Circuit adopted a five-factor test for determining whether a plaintiff is a public figure: (1) whether the plaintiff had access to the channels of effective communication; (2) whether the plaintiff voluntarily assumed a role of special prominence in a public controversy by attempting to influence its outcome; (3) whether the plaintiff did in fact seek to influence the outcome; (4) whether the controversy existed prior to publication of the allegedly defamatory statements; and (5) whether the plaintiff retained public figure status at the time of the alleged defamation.  Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 668 (1982); see also Reuber, 925 F.2d 703; Carr v. Forbes, Inc., 259 F.3d 273 (4th Cir. 2001).

In Fitzgerald v. Penthouse Int'l, Ltd., the Court deemed the plaintiff a limited purpose public figure for purposes of a magazine article concerning the abuse of trained dolphins by the United States government.  691 F.2d at 668.  Persuasive to the court was the fact that plaintiff had researched the military use of dolphin technology for the United States Navy, and had lectured and published several articles on the subject.  Id. at 669.  The Court also noted that the plaintiff had been interviewed on a television program and by a newspaper.  The

13

Court found there to be a pre-existing public controversy because the national press had covered the use of dolphins in Vietnam, and the subject had been addressed in the media. _Id._ The Court also found that the plaintiff had sought to influence the outcome of the controversy by lecturing and publishing on the topic. _Id._

In _Reuber v. Food Chem. News, Inc._, the Fourth Circuit accorded public figure status to a scientist who had performed research for the government on the pesticide, Malathion. 925 F.2d at 706-07. The plaintiff was the subject of an article about his involvement in a controversy surrounding the subject matter of his research. The plaintiff was held to be a limited purpose public figure for purposes of an article on the health risks posed by Malathion. _Id._ The Court found that the plaintiff had significant access to channels of communication because he had testified before Congress and the Environmental Protection Agency, and had given lectures on the subject of health risks posed by the pesticide. _Id._ Additionally, the plaintiff had provided interviews to a newspaper, and had published several scientific papers on the subject. _Id._ His conduct, according to the Court, was sufficient to show that he had voluntarily assumed a role of special prominence in the controversy, and attempted to influence the controversy by challenging the government's conclusions regarding the controversy. _Id._ at 709-10.

14

Most recently, the Fourth Circuit announced in Carr v. Forbes, Inc., that the "heart of the five-factor test is the second and third factors." 259 F.3d. at 280.  Applying those factors, the Court found that "an engineer who develops privately funded public infrastructure projects" was a limited purpose public figure because his conduct when beyond simple government contracting.  The plaintiff also invited public attention to himself and the contracts, making affirmative efforts to "engender public support" for specific public works projects, and seeking to achieve a level of "prominence in [his] professional field." Id. at 280-81 (citing Reuber, 925 F.2d at 709).
 Id.

Like the plaintiffs in Fitzgerald, Reuber, and Carr, Plaintiff satisfies the requirements for limited purpose public figure status.  First, Plaintiff indeed had and still has access to numerous channels of communication, and in fact, had access to some of the most well-known media outlets.  For example, Plaintiff appeared as a guest-expert on CBS News Radio, and as recently as 2002, Plaintiff spoke with reporters for ABC News, The New York Times, and The Baltimore Sun about the investigation of the anthrax mailings.  Plaintiff also published an article in a scientific journal on the threat of bioterrorism.  Based upon these facts, it appears that Plaintiff had ready access to members of various news media.

15

As to the second and third factors, Plaintiff was a vocal critic of the government's level of preparedness for a bioterrorist attack.  His lectures, writings, participation on panels, and interviews, as well as his own resume, led many to consider Plaintiff an expert in the field of biological weaponry. This is supported by testimony from those in the scientific community, as well as the fact of his retention by various government agencies.  Based on this conduct, the Court can rightly conclude that Plaintiff voluntarily assumed a role of special prominence in the public debate over the nation's preparedness for a biological attack, and indeed sought to influence government policy.

Fourth, the controversy into which Plaintiff thrust himself can be properly defined as the government's handling of the bioterrorism threat, and more specifically, its handling of the anthrax investigation.  All of the columns at issue expressly addressed the efficacy of the federal government's efforts to protect the nation from a bioterrorist attack.  The controversy over the nation's preparedness for a bioterrorist attack existed years before the Times published Kristof's articles.  The controversy over the FBI's handling of the anthrax investigation began in the fall of 2001, also before the Times published any of the columns in question.  Indeed, Plaintiff was publicly identified as a potential suspect by the press on several

16

occasions before the first column at issue was ever published.

Finally, Plaintiff was a public figure at the time the allegedly defamatory columns were published.  Plaintiff spoke with a reporter for ABC News on the subject of the anthrax mailings after the mailings occurred but before the Times published any of Mr. Kristof's columns.

Even if Plaintiff did not voluntarily inject himself into the public controversy surrounding bioterrorism, he still qualifies for public figure status.  Even involuntary participants can be public figures when they choose a course of conduct which invites public attention.  See e.g., Reuber, 925 F.2d at 710.  Plaintiff should have foreseen that by providing interviews, delivering lectures, and publishing articles on the subject of the bioterrorism threat, a public interest in him would arise.  Because Plaintiff engaged in a course of conduct that was likely to invite attention and scrutiny, Plaintiff cannot now claim that he was a private figure who was dragged into this controversy unwillingly.  This Court finds that Plaintiff is a public figure in the context of this particular controversy - the government's handling of the bioterrorism threat - covered by the columns at issue in this litigation.

As a public official and public figure, Plaintiff can only recover for defamation if he can show that Defendant acted with actual malice in publishing the columns at issue.  See Carr, 259

17

F.3d at 282.  Actual malice may be proven by showing that a
defamatory statement was made (1) with knowledge that it was
false, or (2) with reckless disregard of its falsity, i.e., a
"high degree of awareness of its probable falsity."  Reuber, 925
F.2d at 714 (quoting Garrison v. Louisiana, 379 U.S. 64, 74
(1964)).  Actual malice must be established by clear and
convincing evidence.  Carr, 259 F.3d at 283.

The Fourth Circuit comprehensively addressed the actual
malice standard in Ryan v. Brooks, 634 F.2d 726 (4th Cir. 1980),
and provided examples of what kind of evidence will satisfy the
standard.  The Fourth Circuit acknowledged that actual malice
requires "much more than a mere failure to exercise ordinary care
in verifying statements."  Id. at 731-32.  For example, the
Fourth Circuit explained that evidence such as "publication of a
completely fabricated story, or of one based on an unverified
anonymous telephone call, or publication where there are obvious
reasons to doubt the veracity of the informant" could make the
requisite showing.  Id. at 732.  However, if the sources of the
fodder for the defamatory statements appeared reliable and
defendant did not seriously doubt the veracity of accuracy of the
information, the actual malice standard would not be satisfied.
Id. at 734; see also St. Amant v. Thompson, 390 U.S. 727, 731
(1968) (stating that "reckless conduct is not measured by whether
a reasonably prudent man would have published, or would have

18

investigated before publishing" and "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication").

To avoid summary judgment, Plaintiff must "forecast evidence sufficient to prove actual malice by clear and convincing evidence." Carr, 259 F.3d at 282.  In this case, Defendant is entitled to summary judgment because there is no evidence to establish that Mr. Kristof knew of the falsity of his statements, or that he harbored a "high degree of awareness" of the probable falsity of his statements.  The evidence in the record demonstrates that Mr. Kristof did not believe that any of his statements were false.  Moreover, by the time he wrote the columns at issue, Mr. Kristof was aware that Plaintiff had been identified as a person of interest in the investigation and that a number of media outlets had published facts raising suspicion about Plaintiff's possible connection to the mailings.  Mr. Kristof also knew that several profiles of the anthrax killer generated by the FBI and others in the scientific community matched Plaintiff closely.  Mr. Kristof spoke with a number of scientific experts as well as Plaintiff's colleagues, many of whom agreed that Plaintiff ought to be investigated further. Moreover, Mr. Kristof personally reviewed hundreds of documents, including Plaintiff's own resume, that he believed confirmed Plaintiff's ability to make anthrax and Plaintiff's potential

19

access to the type of anthrax used in the attacks.

Additionally, no evidence exists tending to show that Mr. Kristof had a high degree of awareness of the probable falsity of his columns.  At best, the evidence reveals that, when Mr. Kristof published his columns, he did not know whether or not Plaintiff was the anthrax mailer, but did believe that Plaintiff was someone that FBI should investigate more thoroughly.  Even if Mr. Kristof was not certain as to the truth of the alleged implication of guilt, this would not be sufficient to support a finding that he was highly aware of its probable falsity.

Plaintiff contends that Mr. Kristof was warned that one of his main sources, Dr. Barbara Rosenberg, was not trustworthy. Plaintiff's attempt to paint Dr. Rosenberg as a conspiracy theorist with absolutely no credibility is contrary to the evidence on record.  Dr. Rosenberg was considered an expert in the field of bioweaponry, and headed a working group for bio-weapons for the Federation of American Scientists.   She was called upon by the FBI to discuss the anthrax investigation, and briefed Senate members on the investigation.  Given her background, Plaintiff has shown had no reason that Mr. Kristof should have doubted the veracity of Dr. Rosenberg as an informant, even if others expressed disagreement with her theories.

Based on all the information he had gathered, Mr. Kristof

20

had no reason to seriously doubt that Plaintiff could have been the anthrax mailer.  Therefore, Plaintiff cannot demonstrate that Defendant published the columns at issue with actual malice.

The second count of Plaintiff's complaint alleges that eleven "discrete false and reckless allegations" made in the columns constitute defamation because they tend to incriminate Plaintiff in the anthrax mailings.  These allegations include the following: Plaintiff unquestionably had the ability to make first-rate anthrax; Plaintiff was one of several scientists who had "ability to access and motive to send anthrax"; Plaintiff had access to an "isolated residence" in the fall of 2001 and "gave Cipro to people who visited" the residence; Plaintiff had anthrax vaccinations that were up to date; Plaintiff "failed 3 successive polygraph examinations"; Plaintiff was "upset with the United States Government for a period preceding the anthrax attack"; and Plaintiff had expertise in dry biological weapon agents.

In this Court's 2004 opinion dismissing this matter, this Court applied the reasoning adopted by the Second Circuit in Herbert v. Lando, 781 F.2d 298, 307-08, 312 (2d Cir. 1986), which held that a plaintiff's inability to carry his burden of proving defamation with respect to the implications of the publication as a whole precluded him from surviving summary judgment with respect to the specific statements when they imply the same defamatory meaning.  See Hatfill v. The New York Times Co., Civ.

No. 1:04-807, 2004 U.S. Dist. LEXIS 27530 (Nov. 24, 2004).  Under this "subsidiary meaning" doctrine, when a publication as a whole is not actionable for defamation, "other statements . . . should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held there can be no recovery."  Herbert, 781 F.2d at 312.

Applying the "subsidiary meaning doctrine," if the Court determines that Defendant is entitled to summary judgment with respect to the overall implication alleged in Count One, then there can be no recovery for the defamation alleged in Count Two because the defamatory implication of the discrete statements is not truly distinct from the larger thrust of the columns.  In other words, the alleged defamatory impact of the columns in the aggregate is no different from the defamatory implication allegedly conveyed by each of the individual statements.

Even if the discrete statements alleged in Count Two were independently actionable, Defendant is still entitled to summary judgment because Plaintiff has not come forth with evidence demonstrating that the statements are materially false.  This showing of falsity is required of all defamation plaintiffs where the allegedly defamatory statements touch upon a matter of public concern.  See Wells v. Liddy, 186 F.3d 505, 532 n.21 (4th Cir. 1999).  A statement is deemed substantially true for purposes of

defamation actions where "the substance, the gist, the sting, of
the libelous charge be justified." Masson v. New Yorker
Magazine, 501 U.S. 496, 517 (1991) (quoting Heuer v. Kee, 59 P.2d
1063, 1064 (Cal. 1936)). Further, a statement will not be
considered false unless it "would have a different effect on the
mind of the reader from that which the pleaded truth would have
produced." Id. (citation omitted). Thus, minor or irrelevant
inaccuracies will not render a statement materially false.

Plaintiff unsuccessfully attempts to show the material
falsity of the allegedly defamatory statements. First, for
instance Plaintiff challenges the allegation that he had access
to anthrax. Plaintiff points out that he only had access to a
storage closet at Fort Detrick in which wet anthrax was kept, but
that he did not know that anthrax was contained therein.
Plaintiff contends that this fact, if taken as true, proves the
material falsity of the statement that Plaintiff had access to
the Fort Detrick Labs where anthrax was kept. This Court
disagrees. This is a case of an irrelevant inaccuracy, one in
which pleaded truth would not have a different effect on the mind
of the reader. See Masson, 501 U.S. at 517. The allegation that
Plaintiff had access to anthrax is not rendered false simply
because Plaintiff did not know he had access to anthrax. The
fact that it was wet anthrax as opposed the to dry anthrax used
in the anthrax mailings would likely not change the mind of the

ordinary reader.  A failure to include such a qualification does not form the basis for liability in a defamation action of this type.

Plaintiff next contends that the allegation that he had expertise in dry biological weapon agents is materially false because he has never made dry anthrax, has never done laboratory research on dry anthrax, and does not know how to make dry anthrax.  Plaintiff's own assertions of what he knows or does not know cannot create a triable issue on a motion for summary judgment where there is substantial evidence that Plaintiff did in fact have extensive knowledge about biological weapons and agents.  Furthermore, the record shows that Plaintiff touted himself as having working knowledge of wet and dry biological weapon agents, and even bragged to a colleague about his ability to make anthrax.

Plaintiff also challenges the statement that he had access to an isolated residence and gave Cipro to people who visited the residence.  Plaintiff offered testimony of the owner of the residence in question, who testified that Plaintiff never visited the home without the owner, and therefore did not have unrestricted access.  This fact does not alter the substantial truth of the statement that Plaintiff visited the residence, and thus had access to the residence.  Furthermore, although

24

Plaintiff denies that he ever gave Cipro to anyone at the residence, the record is undisputed that taking Cipro was discussed during an October 2001 visit to the residence and that Plaintiff had dispensed Cipro to multiple persons before that weekend.  Whether Plaintiff dispensed Cipro while at the residence or at some other point does not alter the gist of the published statement in any material way.

Plaintiff also challenges the statement that he failed three polygraph examinations, but he has not come forth with evidence sufficient to show that the published statement is materially false.  Plaintiff contends that he only took one polygraph examination and that he did so voluntarily.  However, it is undisputed that the FBI administered at least one polygraph examination that involved more than one test sequence.  It is also undisputed that Plaintiff retained his own polygrapher in 2002.  The FBI's continuing interest in Plaintiff even after the polygraph exam provides circumstantial evidence that the examination did not extinguish suspicion of Plaintiff.  Thus, Plaintiff cannot show that this statement, even if inaccurate as to the exact number of polygraph examinations administered, is materially false.

Finally, Plaintiff challenges the statement that his private writings showed animus to federal agencies.  Plaintiff claims

that one writing in particular only showed dissatisfaction with one individual, an individual who was instrumental in suspending his security clearance.  However, Plaintiff also authored a later writing, in which he described the government's conclusions with respect to a CIA security decision as dated and illogical. Plaintiff has offered no evidence to contradict the veracity of these facts, or of the underlying gist that Plaintiff was displeased with the government's decision to terminate his security clearance.

Based on the foregoing, Plaintiff cannot carry his burden of proving the material falsity of any of these statements as a matter of law.  Accordingly, Defendant is entitled to summary judgment with respect to Count Two on this ground.

Plaintiff's third Count alleges intentional infliction of emotional distress.  Under Virginia law, to recover for intentional infliction of emotional distress, four elements must be proved: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe."  Womack v. Eldridge, 210 S.E.2d 145, 148 (Va. 1974).

As set forth above, Plaintiff cannot prevail on his defamation claim and is unable to prove the elements necessary to

recover for intentional infliction of emotional distress.  First,
Plaintiff cannot make the requisite showing that Defendant
intentionally or recklessly caused him severe emotional distress.
This showing may be made by evidence that Defendant specifically
intended to cause him severe distress or acted recklessly with
respect to whether its conduct would cause his such severe
distress.  See, e.g., Womack, 210 S.E.2d at 148.  Plaintiff has
not made such a showing.  In fact, the record shows that
Defendant made efforts to avoid implicating his guilt.  Mr.
Kristof reminded readers to assume Plaintiff's innocence, and
highlighted the fact that Plaintiff was viewed by his family and
friends as a patriot who could not have perpetrated the crime in
question.  The record is void of any evidence tending to show
that Mr. Kristof intended to cause Plaintiff severe distress or
that he was reckless in this regard.

Finally, Plaintiff cannot prove that Defendant's conduct was
sufficiently outrageous.  Plaintiff has failed to satisfy his
burden of showing that Defendant engaged in any form of
misconduct.  Defendant did not act with malice when it published
Kristof's columns.  Additionally, Mr. Kristof cautiously worded
the columns to indicate that Plaintiff was to be presumed
innocent, and declined to reveal the true identity of Plaintiff
until the Plaintiff himself publicly responded to the

allegations.  Therefore, Plaintiff cannot satisfy his burden as to Count Three of his complaint.

Considering all inferences in the light most favorable to Plaintiff, there is no evidence that would allow a jury to find that Defendant defamed Plaintiff or intentionally caused him severe emotional distress.  Thus, Defendant is entitled to summary judgment on all counts.

An appropriate Order shall issue.

/S/

_____
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
January 30, 2007

28